UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| AMANDA PENNUCCI-ANDERSON | * | CIVIL ACTION |
| VERSUS | * | NO. 19-271-DPC |
| OCHSNER HEALTH SYSTEM, ET AL. | * | CONMAG  DIV. (2) |

## ORDER AND REASONS

Defendant Ochsner Clinic Foundation's ("Ochsner") Motion for Summary Judgment (ECF No. 52) is pending before me in this matter.  Ochsner seeks summary judgment on Plaintiff Amanda Pennucci-Anderson's claims of gender discrimination under Title VII and pregnancy discrimination under Title VII and the Pregnancy Discrimination Act of 1978.  Plaintiff filed an untimely Opposition Memorandum (ECF No. 53), after which this Court continued the submission date until December 2, 2020.  ECF No. 54.  Ochsner filed a Reply Memorandum.  ECF No. 55.

After hearing oral argument on the motion on Wednesday, December 2, 2020, the Court took this matter under advisement.  Having considered the record, the oral and written arguments of counsel, and the applicable law, IT IS ORDERED that Defendant's motion is GRANTED for the reasons stated herein.

## I.     BACKGROUND

Plaintiff Amanda Pennucci-Anderson's first job as a registered nurse was when she joined Ochsner's Post-Operative Surgical Services Department in March, 2014.  In May 2015, she transferred to Ochsner-Kenner's ICU Department.  ECF Nos. 52-6 & 53-1, ⁋⁋ 1-2; No. 52-2 Deposition of Amanda Pennucci-Anderson, at 22:18-25:7.  Plaintiff worked in Ochsner's ICU Department until her termination on September 22, 2017.  ECF No. 52-2, at 92-93.

On April 21, 2017, Plaintiff underwent in vitro fertilization.[1]  Around that time, Plaintiff requested a lifting restriction accommodation.  ECF Nos. 52-6 & 53-1, at 11.  Three exhibits are relevant to Plaintiff's accommodation request:

(1) The Frozen Embryo Transfer Information ("FETI") form to establish her medical accommodation request.  ECF 52-2, at 60.  This undated document is a preprinted form with blanks that were filled in by hand with Plaintiff's name and other information.  The form is not signed by anyone, is not on letterhead of any clinic or physician though there is a box that is checked next to the name Dr. Wells immediately below the line with Plaintiff's handwritten name on it.  Although undated, there is reference to Day O as 4/21/17, which was a Friday, Day 5 as 4/27/17, which was a Thursday, and a Pregnancy Test Date of 5/5, which was a Friday.  At the bottom section, under INSTRUCTIONS, the form reads, in pertinent part:

- BEDREST for 3 days following embryo transfer
- No heavy lifting (greater than 20-25 lbs) or other strenuous activity until after first OB ultrasound[2]

(2) Text Exchange between Plaintiff and Charge Nurse Libby Swift dated April 26-27, 2017, stating:

Swift:  Hope you're feeling okay!

Angelle wanted to know [i]f you've clarified that letter you sent to her the other day.  I can't put a schedule in for you until it's done.

Plaintiff:  Until 5/5, I cannot lift over 30 pounds.  But she said I could perform the other functions of my job.  . . .

Swift:  Hey.  With any kind of limitations or restrictions, You  can not work at the bedside.  Please call Liberty Mutual at 1-866-501-8736  please understand we will fill all of your time with GPT until we hear back from you.

Plaintiff:  [From Audubon's Jamie Reyes to Plaintiff, forwarded to Swift]:

Amanda there is no need for FMLA or light duty at this point or after the transfer.  Yes you are correct on the do's and dont's that you listed below.  You can be normal at work and function as any other

---

[1] Although Plaintiff's Uncontested Facts assert that the embryo transfer occurred on April 26, 2017 (ECF No. 53-1, ₱ 10), the Frozen Embryo Transfer Information Form indicates the procedure occurred on April 21, 2017.  ECF No. 5202, at 60.  During oral argument, Plaintiff's counsel confirmed that the transfer took place on April 21, 2017, not April 26, 2017.
[2] ECF No. 52-2, at 60.

pregnant nurse does.  Please let me know if there is anything that you need.

Plaintiff later texted Libby Swift this message on April 26, 2017:

I do have restrictions though – I can't transport patients alone in the big giant bed by myself and I can't pull over an obese patient.  I can pull patients that are under 200 pounds . . . with assistance.  My doctor is writing a note. This is not different from other pregnant women btw.[3]

(3) Letter dated April 27, 2017 from Dr. Lindsay Wells MD on Audubon Fertility stationery stating, in pertinent part:  "Amanda Pennucci-Anderson is currently under no restrictions while at work."[4]

The parties dispute how, when, and to whom these documents were submitted.  ECF 52-6 & 53-1, at 12-18.  Plaintiff testified that she provided an unnamed charge nurse (either Libby Swift or Desiree) with the FETI form indicating that she had "a minor weight lift restriction until [her] first OB ultrasound" and showed Unit Director Angelle Bonura the  form as well.  ECF Nos. 53-5; 52-2, at 39:14-23.  Plaintiff states that Angelle Bonura told her "I wish I had not seen this" because "Ochsner made 'no accommodation for pregnancy' . . . . [T]here is no light duty nursing." *Id*.  Plaintiff states that Angelle told her "now that she had seen [the] limitation in writing she must remove [Plaintiff] from the schedule until [Plaintiff] could provide clearance from [her] physician that [she] could work with no restrictions." *Id.*  In any event, after Dr. Wells' April 27, 2017 letter, Defendant scheduled Plaintiff, and Plaintiff worked, her normal, regularly scheduled shifts without limitation.

On June 30, 2017, Plaintiff failed to complete her Advanced Cardiac Life Support Certification, which triggered Ochsner's progressive discipline policy and resulted in a 60-day Probationary Period for Plaintiff's failure to maintain required certifications.  ECF Nos. 52-6, ¶¶ 19-24; 53-1, ¶¶ 19-24.  Before, during and after the probationary period, Plaintiff appeared on the

---

[3] ECF No. 52-2, at 61-62; No. 53-3, at 1-4.
[4] ECF No. 52-2, at 65.

narcotics "hot list." Specifically, for eight of the first nine months of 2017 (i.e., January, February, March, April, June, July, August and September), Plaintiff appeared on the narcotics "hot list." ECF Nos. 52-6, ⁋ 31; 53-1, ⁋ 31. Plaintiff also appeared on a Controlled Substance Discrepancy List several times. ECF No. 52-6, ⁋ 34 & n. 2.[5] Ochsner notes that, on August 11, 2017, after one of Plaintiff's Controlled Substance Discrepancy appearances, it coached Plaintiff on proper narcotics waste procedures and asked Plaintiff to share that information with her precepees to ensure proper narcotics handling. ECF No. 52-2, Depo. at 78:17-82:11 & ECF No. 52-2, at 73.

On September 22, 2017, following an investigation into the care Plaintiff provided for a patient during an overnight shift that began on September 14, 2017, Defendant terminated Plaintiff's employment. ECF 52-2, at 84:17-3. Before Plaintiff began the overnight shift on September 14, 2017, the patient had consistently denied having pain. ECF No. 52-2, at 93:6-94:17; at 74-84 & 87. Plaintiff represented that, during her shift, the patient reported her pain increased to a 7 and then as high as a 10, with 10 being the highest possible rating. ECF No. 52-2, Deposition at 96:2-14; 52-2 at 74-84 & 87. Although the patient had received Fentanyl only one time three days earlier, specifically on September 11, 2017, during Plaintiff's September 14, 2017 shift, she administered eight doses of Fentanyl to the patient within nine hours. ECF No. 52-4, ⁋⁋ 15 & 17.

The morning shift nurse assigned to this patient following Plaintiff's shift contacted Clinical Coordinator Nurse Colleen Rogers to report her concerns about excessive pain medication given to the patient. *Id*. ⁋ 7. Nurse Rogers conducted an investigation into the matter, which

---

[5] Although Ochsner produced a redacted copy of the "hot list" and objected to producing the Controlled Substance Discrepancy List during discovery based on Louisiana's medical peer review privilege, because federal privilege law, not state privilege law, applies in this Title VII/federal question case under Fed. R. Evid. 501, during oral argument, this Court instructed Ochsner to submit, for *in camera* inspection, the hot list and Controlled Substance Discrepancy List assigning an alias to each nurse on the list to enable the Court to review for potential comparators. Ochsner's revised document is filed under seal at ECF No. 57,

included a review of the patient's records, Medication Administration Report, physician orders, Pyxis machine dispense times, and Epic record of time of administration of medications. *Id*. ¶¶ 8, 11-14.  The doctor's medication orders specified that Fentanyl was to be administered only if Precedex was inadequate for pain, but Precedex had been discontinued on September 12, 2017, and Plaintiff did not contact the physician regarding any change in the patient's condition or pain reports. *Id.* ¶¶ 9 & 16.  After Nurse Roger's investigation, Director Angelle Bonura, Chief Nursing Officer Sylvia Hartmann, and Human Resources Representative Kelly Schello met with Plaintiff regarding the issues arising from her September 14, 2017 shift.  ECF No. 52-3, ¶¶ 35-38.  Based on their view that Plaintiff was unable to provide a sufficient explanation for unaccounted for narcotics, Ochsner terminated Plaintiff's employment for, among other things, unsatisfactory job performance relating to her improper documenting appropriate administration of nine doses of Fentanyl for a patient on the night shift of September 14, 2017, and because her documentation was inconsistent with her verbal explanation and the patient's understanding of care, which resulted in 100 mcg of Fentanyl being unaccounted for.  ECF No. 52-2, at 92; 52-3, ¶¶39-40.

## II.     APPLICABLE LAW

Plaintiff filed suit alleging discrimination under Title VII and the Pregnancy Discrimination Act alleging that her termination was based on her gender and pregnancy and that Defendant failed to accommodate her pregnancy-related April 2017 lifting restriction while it accommodates non-pregnancy related lifting restrictions.  *See* Second Amended Complaint, ECF No. 26, ¶¶1, 24-32.  Defendant Ochsner has filed a Motion for Summary Judgment seeking dismissal of all claims because (1) Plaintiff cannot establish a failure to accommodate a light duty restriction due to her pregnancy because, by letter dated April 27, 2017, her own physician confirmed that she had no work restrictions; (2) Plaintiff fails to establish that any similarly

situated non-pregnant employee in nearly identical circumstances was treated differently with regard to work accommodations; (3) Plaintiff's subjective belief of discrimination is insufficient; and (4) Defendant had legitimate business reasons for terminating Plaintiff's employment. *See* ECF Nos. 52-1, 55. Plaintiff opposes the motion, arguing that there are material facts in dispute regarding whether Plaintiff required medical accommodation in April 2017 and whether the termination decision was motivated by Plaintiff's pregnancy or gender. *See* ECF No. 53.

## A. **Rule 56 Standard**

Rule 56 mandates that summary judgment be issued "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[6] Summary judgment is not precluded by disputes over facts that are not "material"[7] and disputes that are not "genuine."[8] "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[9] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[10] Thus, the court must resolve factual controversies in favor of the nonmoving party "only where there is an actual controversy, that is, when both parties have submitted evidence of

---

[6] Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

[7] A fact is material if its resolution could affect the outcome of the action. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P*., 627 F.3d 134, 138 (5th Cir. 2010) (citation omitted).

[8] A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*., 477 U.S. at 248; *see also Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (same) (citations omitted).

[9] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins*., 530 F.3d 395, 398-99 (5th Cir. 2008).

[10] *Galindo v. Precision Am. Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.

contradictory facts."[11]

When the moving party carries its initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of a material fact.  If, however, the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.[12]  "Summary judgment is thus proper if the party opposing the motion fails to establish an essential element of her case.[13]

Only evidence—not argument, not facts in the complaint—will satisfy the burden.[14] Unsworn pleadings, memoranda or the like are not competent summary judgment evidence.[15] Summary judgment affidavits must be based on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated therein.[16]  Statements made by affiants without personal knowledge are not capable of being presented in admissible form at trial.[17]  Summary judgment affidavits need not, however, use any magic language, provided the affiant's personal knowledge and competence are reasonably inferred from their positions and the nature of their participation in the matters to which they

---

[11] *Antoine v. First Student, Inc*., 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).
[12] *Celotex*, 477 U.S. at 322–25; *see also Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir. 1993); *Duplantis v. Shell Offshore, Inc*., 948 F.2d 187, 190 (5th Cir. 1991).
[13] *See Celotex*, 477 U.S. at 322-23.
[14] *Solo Serve Corp. v. Westowne Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).
[15] *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991).
[16] Fed. R. Civ. P. 56(c)(4).
[17] *D'Onofrio v. Vacation Publications, Inc*., 888 F.3d 197, 208 (5th Cir 2018) (citations omitted); *see also* McWhirter v. AAA Life Ins. Co., 622 F. App'x 364, 366 (5th Cir. 2015) (affidavit based on witness' belief rather than personal knowledge is insufficient summary judgment evidence); *Meadaa v. K.A.P. Enterprises, L.L.C*., 756 F.3d 875, 881 (5th Cir. 2014) (summary judgment affidavit does not meet the personal knowledge requirement simply because the affiant states that her conclusions are based on personal knowledge. Rather, the affiant must provide sufficient information to allow the court to conclude that the affiant's assertions are indeed based on personal knowledge); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (holding that conclusory assertions in affidavit could not be relied upon in summary judgment proceedings).

swore.[18]  Likewise, generalized testimony of a party's subjective belief is insufficient to create an issue for trial when the beliefs are not substantiated.[19]

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.[20]  "If the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate.[21]

## B. <u>Title VII and the Pregnancy Discrimination Act</u>

Title VII of the Civil Rights Act of 1964 prohibits covered employers from discriminating against any individual with respect to "terms, conditions, or privileges of employment, because of such individual's . . .  sex."[22]  The Pregnancy Discrimination Act clarified that this extends to discrimination "because or on the basis of pregnancy, childbirth, or related medical conditions," and requires employers to treat women affected by such conditions "the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work."[23] Pregnancy Discrimination Act claims are analyzed like any other Title VII discrimination claim.[24]

In the employment context, a plaintiff often relies on indirect evidence of discrimination using the burden-shifting framework of *McDonnell Douglas.*[25]  This requires that plaintiff initially establish a prima facie case by carrying her summary judgment burden to show genuine disputes

---

[18] *Matter of Green*, 968 F.3d 516, 523-24 (5th Cir. 2020) (noting personal knowledge may be inferred based on affiant's "sphere of responsibility"); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529–30 (5th Cir. 2005) (inferring personal knowledge based on finding that testimony fell within affiant's "sphere of responsibility").
[19] *Bickerstaff v. Whitney Nat'l Bank*, 99 F.3d 1135, at *3 (5th Cir. 1996) (summary calendar); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 654 (5th Cir. 2004); *Armendariz v. Pinkerton Tobacco Co*., 58 F.3d 144, 152-53 (5th Cir. 1995) (A plaintiff's subjective beliefs are not sufficient to create an issue of fact).
[20] *See Bickerstaff*, 99 F.3d at *2; *see also EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014) ("No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.").
[21] *Anderson*, 477 U.S. at 249-50 (citations omitted).
[22] *Young v. United Parcel Serv., Inc*., 135 S. Ct. 1338, 1344 (2015) (quoting 42 U.S.C. § 2000e-2(a)(1)).
[23] 42 U.S.C. § 2000e(k).
[24] *Fairchild v. All Am. Check Cashing, Inc*., 815 F.3d 959, 966 (5th Cir. 2016).
[25] *McDonnell Douglas Corp. v. Green* 411 U.S. 792, 802–03, 93 S. Ct. 1817 (1973).

of material fact over whether she (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside her protected group, was treated less favorably than other similarly situated employees outside the protected group, or was otherwise discharged because of her protected trait.[26]

A plaintiff who proffers "a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'"[27]  Specifically, "[t]he employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."[28] While the plaintiff must show that a comparator was treated more favorably in nearly identical circumstances, she need not prove that the circumstances were identical to her own in every way.[29]

If the plaintiff carries this burden under *McDonnell Douglas*, a presumption of discrimination arises and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination.[30]  If the employer does so, the burden returns to plaintiff to prove by a preponderance of the evidence that the employer's proffered reasons were not its true reasons, but were "a pretext for discrimination, or that a 'motivating factor' of the

---

[26] *E.g., Roberson-King v. Louisiana Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018); *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Lee v. Kansas City Southern Ry. Co*., 574 F.3d 253, 259 (5th Cir. 2009); *see also Nguyen v. Univ. of Texas Sch. of Law*, 542 F. App'x 320, 323 (5th Cir. 2013).
[27] *Lee*, 574 F.3d at 260 (quotation omitted) (alteration in original); *see also Santos v. Wincor Nixdorf, Inc*., 778 F. App'x 300, 303 (5th Cir. 2019).
[28] *Lee*, 574 F.3d at 260 (footnotes omitted).
[29] *See id*. at 260–61.
[30] *Harville v. City of Houston, Mississippi*, 945 F.3d 870, 875 (5th Cir. 2019)

9

employment decision was the plaintiff's protected characteristic."[31]   The issue at the pretext stage is not whether the employer's reason was actually correct or fair, but whether the decisionmakers honestly believed the reason."[32]   Plaintiff must create an issue regarding whether "the employer honestly believes in the reasons it offers, not whether [the employer] made a bad decision."[33]

When the employer satisfies its burden of production by articulating a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination "simply drops out of the picture" and plaintiff must prove that the defendant intentionally discriminated against her because of his protected characteristic.[34]   A plaintiff may carry that burden by establishing pretext, either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence,[35] i.e., that the employer's articulated reasons were not its true reasons, but are a pretext for discrimination.[36]   A plaintiff's prima facie case, "combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."[37]   A plaintiff is not, however, relieved of her burden to present evidence that will permit a rational factfinder to infer intentional discrimination.[38]

---

[31] *Sacchetti v. Optiv Sec., Inc*., 819 F. App'x 251, 253-54 (5th Cir. 2020) (citing *Rogers v. Pearland Indep. Sch. Dist*., 827 F.3d 403, 408 (5th Cir. 2016) (quoting *McDonnell Douglas Corp*., 411 U.S. at 802))

[32] *Harville*, 945 F.3d at 877 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) ("The issue at the pretext stage is whether Appellee's reason, even if incorrect, was the real reason for Appellant's termination.")); *Goudeau*, 793 F.3d at 476 (citation omitted).

[33] *Harris v. Double G. Coatings, Inc*., 114 F.3d 1184, at *2 n.4 & *7 (5th Cir. 1997) (Table) (citations omitted).

[34] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citations omitted).

[35] *Harville*, 945 F.3d at 879 (citation omitted).

[36] *Goudeau v. Nat'l Oilwell Varco, L.P*., 793 F.3d 470, 476 (5th Cir. 2015) (citing *Squyres*, 782 F.3d at 231 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000))).

[37] *Reeves*, 530 U.S. at 148;  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see also Williams v. Waste Mgmt., Inc*., 818 F. App'x 315, 319 (5th Cir. 2020).

[38] *Harville*, 945 F.3d at 877 (citing *Reeves*, 530 U.S. at 153 (noting that the "ultimate question" in cases alleging employment discrimination "is whether the plaintiff was the victim of intentional discrimination" and reminding that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (internal quotation marks and alterations omitted)).

Even in the face of pretext, when no rational factfinder could conclude that the action was discriminatory, such as when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred, summary judgment will be proper.[39]   Further, the anti-discrimination laws do not ask a court to sit as a super-personnel department that reexamines an entity's business decisions or the wisdom of those decisions, except so long as those decisions are not the result of discrimination.[40]   The court should not weigh the wisdom of particular employment decisions nor question every management decision and work assignment.  The single issue is whether the employer's decision was motivated by discrimination.[41]

## III.   **ANALYSIS**

### A.   **Failure to Accommodate Claim**

Plaintiff argues that Ochsner failed to accommodate her lifting restriction when it refused to assign her to a sedentary position as it does for other employees with medical restrictions.  ECF No. 53, at 5-6.  She contends that, while other employees with lifting restrictions were provided with a sedentary work alternative, she was told that she either had to provide a doctor's note with no restrictions or use her general purpose time.  ECF 53-2, ¶ 69.  Ochsner asserts that it is committed to extending reasonable accommodations to disabled or pregnant employees.  ECF 52-3, ¶¶ 13-14.  ECF No. 52-6, at ¶5.  It further states that, while it does not allow registered nurses to work at patients' bedsides while under lifting restrictions, nurses with lifting restrictions are

---

[39] *Id*. at 876–77.

[40] *Eyob v. Mitsubishi Caterpillar Forklift America, Inc*., 745 F. App'x 209, 212 (5th Cir. 2018) (citations omitted); *Harris v. Double G. Coatings, Inc*., 114 F.3d 1184, at *2 (5th Cir. 1997) (Table) (citing *Ruby v. Springfield R-12 Public School Dist*., 76 F.3d 909, 912 n.7 (8th Cir.1996) (citation omitted).

[41] *See McVille v. Inter-Community Healthcare, Inc*., 460 F. App'x 353, 355 (5th Cir. 2012) (citing *Hutson v. McDonnell Douglas Corp*., 63 F.3d 771, 781 (8th Cir. 1995); *Deines v. Tex. Dep't of Protective & Regulatory Servs*., 164 F.3d 277, 281 (5th Cir. 1999)).

assigned sedentary work, as available, in the ICU or another department.  *Id*.  Plaintiff "disputes in part" this factual assertion, but she fails to specify what portion she disputes, and she fails to point to the evidence to support her position.  ECF No. 53-1, at ₱9.  For instance, Plaintiff provides no evidence that non-pregnant nurses with lifting restrictions were allowed to work bedside, nor does she identify any non-pregnant comparator with lifting restrictions who worked bedside.  In fact, she later does not dispute the assertion that nurses with lifting restrictions cannot work bedside.  ECF No. 52-6 & 53-1, ₱ 67.

Plaintiff bases her claim on her allegation that she sought a weight lifting accommodation on or about April 21, 2017, but she was not re-assigned to sedentary work immediately.  Despite the unambiguous language in Dr. Wells' April 27, 2017, letter, Plaintiff argues that, even after that letter, she had a "no heavy lifting restriction," relying on the earlier, undated FETI form and text message exchange.  ECF No. 53-1, ₱₱ 17-18.  In light of Dr. Wells' April 27, 2017, letter, however, Plaintiff has no factual basis to support a failure to accommodate claim after April 27, 2017, because an employer is entitled to rely on medical documentation provided by an employee, and Dr. Wells' letter was the specific, more recent medical statement as to Plaintiff's limitations.[42]

Given Dr. Wells' April 27, 2017 letter, Plaintiff's failure to accommodate claim is, at most, a claim for delayed accommodation for the April 22-26 period.[43]  Notably, Plaintiff ignores Ochsner's clarification request regarding Plaintiff's restrictions so that the accommodation process

---

[42] *See, e.g., Sample v. Holmes Cty., Miss*., No. 3:12CV303-CWR-FKB, 2015 WL 5732177, at *4 (S.D. Miss. Aug. 5, 2015) (employer is allowed to rely on doctor's restrictions in finding that employee could not perform essential job functions) (citing *Solorio v. Am. Airlines, Inc*., No. 00–3780–CIV, 2002 WL 485284, at *6 (S.D. Fla. Feb. 28, 2002) (noting that "[a]n employer complies with the ADA when it bases its employment decision on objective, reliable evidence of the applicant's work restrictions (i.e. the medical opinion of the applicant's own doctor ")) (emphasis added)); *Martin v. State of Kansas*, 996 F. Supp. 1282, 1292 (D. Kan. 1998) (reasoning that the "[defendant] was justified in relying on [the doctor's] restrictions and questioning [plaintiff's] ability to perform the essential functions of the corrections officer position") (citation omitted)).

[43] Accepting as true Plaintiff's evidence that she was on bedrest for three days following the implantation procedure (i.e., until April 24) (ECF No. 52-2, at 60), her claim implicates only April 25 and 26.

could proceed, which Ochsner argues was necessary because plaintiff had provided only an unsigned document (the FETI form) and orally stated different weight limitations.  ECF No. 55, at 8-10.  Then, in response to Ochsner's clarification request, Plaintiff provided the April 27, 2017 letter from Dr. Wells indicating that she had no work restrictions.[44]  At that point, the interactive accommodation process ended because Plaintiff's doctor advised Ochsner that Plaintiff had no medical restrictions.[45]  Plaintiff's claim for failure to accommodate based on, at most, a 6-day delay fails, however, because an employer is not obliged to act with "maximum speed" in the interactive accommodation process.[46]

More significantly, Plaintiff fails to identify a proper comparator whom she can demonstrate was treated differently with regard to the handling of that employee's accommodation request.  Plaintiff proffers as comparators two co-workers with lifting restrictions who were assigned sedentary work:  Kenneth Bird and Yasmin Godsmark.  She provides no evidence, however, to suggest that either of these two comparators were assigned a sedentary position *immediately* upon request or that either of them provided a doctor's note indicating no accommodation was needed after an initial accommodation request.  Plaintiff's counsel conceded during oral argument that she has no evidence regarding how long the interactive accommodation process took for either of these two comparators, how many days passed between the time they

---

[44] Although the parties dispute whether Plaintiff provided Ochsner Unit Director Angelle Bonura with a copy of her FETI form and which text messages, or portions of messages, dated April 26-27 from Audubon Fertility's Jamie Reyes were shared with Ochsner, that dispute is not material given that the parties do not dispute that Plaintiff provided Ochsner with the April 27, 2017 letter from her doctor stating, in pertinent part:  "Amanda Pennucci-Anderson is currently under no restrictions while at work."  ECF No. 52-2, at 65.

[45] *Cf. Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011)  ("difficult to discern what measures may have been taken had accommodation discussions continued" when the interactive process is terminated by plaintiff's retirement) (citing *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 734 (5th Cir. 1999) ("It is difficult to judge the reasonableness of accommodations when the employee withdraws before we can say with any authority what these accommodations would have been.")); *EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009) ("The reasonable accommodation analysis is hindered because [the plaintiff] did not show up for work. Any discussion of the accommodations that might have been provided or denied is mere speculation.").

[46] *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 (5th Cir. 1999).

submitted medical documentation of restrictions and their assignment to sedentary work, or whether they used any General Purpose Time during the interactive process.  Comparators who complete the interactive accommodation process are not in "nearly identical circumstances" to an employee who initiated the interactive accommodation process but did not complete the process due to an intervening doctor's note confirming she had no restrictions.  In the absence of a similarly situated employee in nearly identical circumstances, Plaintiff fails to establish a prima facie case of discrimination based on the alleged failure to accommodate.

### B.  Termination Claim

Plaintiff claims that Ochsner terminated her employment on September 22, 2017 based on her pregnancy and gender, and that Ochsner's stated reasons for the termination are pretextual. ECF No. 53, at 9-10.  Ochsner does not dispute that Plaintiff (1) is a member of a protected class; (2) was qualified for her position; and (3) was discharged.  Neither party presents any evidence regarding whether Plaintiff was replaced by someone outside of her protected class.  Instead, Plaintiff argues that she was treated less favorably than other similarly situated employees outside the protected group or otherwise discharged because of her sex or pregnancy.

Ochsner contends that Plaintiff fails to establish a prima facie case of discrimination, and assuming she could, it has articulated a legitimate business reason for its decision and Plaintiff has no evidence of pretext.  ECF No. 52-1, at 19-23; ECF No. 55, at 4-8.  Plaintiff does not dispute the basic facts underlying Ochsner's stated reasons for termination:  (1) Plaintiff was on the narcotics "hot list" during eight of the first nine months of 2017 (ECF Nos. 52-6 & 53-1, at ¶¶ 24-31);[47] and

---

[47] Although Plaintiff disputes Ochsner's assertion that she appeared on the Controlled Substance Discrepancy list several times (ECF No. 52-6 & 53-1, ¶ 34), which Ochsner supports with the Declaration of Angelle Bonura (ECF No. 52-3, ¶¶ 32 & 34), she does so based on Ochsner's failure to produce documents reflecting same during discovery. ECF No. 53-1, ¶ 34.  Following oral argument, Ochsner provided a redacted Controlled Substance Discrepancy List for *in camera* inspection which has now been filed under seal into the court record.  ECF No. 57.  A review of that document reflects that Plaintiff had the most appearances on the "hot list" (eight times over nine months) and the Controlled Substance Discrepancy list (four times).  *See, e.g., id*. at 1-3.  The next highest number of appearances on

(2) during Plaintiff's September 14, 2017 shift, she represented that the patient reported that her pain increased to a 7 and as high as a 10, the doctor's orders indicated Fentanyl should be administered only if Precedex was inadequate, the order for Precedex had been discontinued, Plaintiff did not contact the doctor, Plaintiff administered eight doses of Fentanyl in less than nine hours, and before Plaintiff's shift, the patient had only one dose of Fentanyl a few days earlier (ECF Nos. 52-6 & 53-1, at ¶¶41-45); and (3) the nurse assigned to the patient the following morning expressed concern to Clinical Coordinator Nurse Rogers about excessive pain medication administered to the patient, after which Nurse Rogers conducted an investigation and determined that there were discrepancies and long lag times between when the Fentanyl was dispensed, administered, and wasted.  ECF Nos. 52-6 & 53-1, ¶¶ 47-50 & 52.

According to the Director of ICU, during the relevant period, there were no other nurses in Ochsner-Kenner's ICU who were (1) placed on Progressive Discipline within the prior 12 months; (2) coached on an issue related to narcotics administration; (3) unable to provide an explanation for discrepancies that resulted in unaccounted for narcotics; and (4) appeared on the hot list multiple times, demonstrating a concerning trend.  ECF No. 52-3, ¶ 43; *see also supra* n. 47.

Plaintiff seeks to establish that she was treated less favorably than employees outside of her protected class by pointing to co-worker Todd Holley.  Relying on the affidavit of Amanda Thornton Prima, a former charge nurse at Ochsner-Kenner, Plaintiff argues that she was treated less favorably than Todd Holley.  Nurse Prima's affidavit states, in pertinent part:

> As a charge nurse I saw many other nurses on our unit have undocumented narcotics. Its [sic] not uncommon for people to forget to scan a drug. Nobody but Amanda Pennucci was ever disciplined for that. Similarly, Amanda was not the only nurse to have had a higher than average narcotic pull rate. In fact, Todd Holley

the "hot list" was a nurse who appeared six times, but that nurse had zero appearances on the Controlled Substance Discrepancy list.  Five nurses had the next highest number of appearances on the Controlled Substance Discrepancy list (two times), but three of those nurses never appeared on the "hot list" and the other two appeared on the "hot list" only once.

> had a much higher pull rate for narcotics and even appeared impaired. It was spoken about openly in our charge meetings that his behaviors were suspicious for diversion of narcotics.  Angelle said it was "a can of worms" to drug test him and she never did while I worked there. To my knowledge, Amanda Pennucci was the only nurse who worked in ICU to ever be drug tested in the time I worked there. And she is the only nurse I have ever heard of to be fired after having a negative drug test. She was around six months pregnant at the time.[48]

Other than stating her position as a charge nurse, Nurse Prima fails to provide any basis upon which the Court can infer that she had sufficient personal knowledge for the opinions expressed in her Affidavit.[49]  While a charge nurse may observe certain activities during her shift and be privy to some managerial information, a charge nurse would not customarily have access to the employment files, drug testing information, or disciplinary information for all of the nurses who may work on the unit.  Indeed, Ochsner states that a charge nurse would not receive the narcotics "hot list" reflecting pull rates.  ECF No. 55, at 3.

Assuming that a charge nurse would have access to complete employee files and all of the information regarding every employee who was disciplined for forgetting to scan a drug, every employee who was drug tested, and/or complete data regarding narcotic pull rates as necessary to establish the proper foundation for Nurse Prima's assertions, her statements still do not establish that Mr. Holley is a similarly situated employee in nearly identical circumstances.  Mr. Holley was not placed on a performance improvement plan within the prior twelve months nor is there evidence that he was counseled on proper narcotics administration and wasting procedures (ECF No. 52-3, ⁋⁋ 45-46), and Nurse Prima does not suggest otherwise.  Likewise, Nurse Prima fails to

---

[48] ECF No. 53-6.
[49] *Matter of Green*, 968 F.3d 516, 523-24 (5th Cir. 2020) (noting personal knowledge may be inferred based on affiant's "sphere of responsibility"); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529–30 (5th Cir. 2005) (inferring personal knowledge based on finding that testimony fell within affiant's "sphere of responsibility").

identify the number of times Mr. Holley appeared on the "hot list," the Controlled Substance Discrepancy list, or a combination of both lists.[50]

Further, Ochsner did not claim to have terminated Plaintiff for having a single (or even several) higher than average pull rates for narcotics or because she forgot to scan a drug.  Ochsner terminated Plaintiff because she (1) failed to follow Ochsner policy on narcotic administration and was unable to provide an explanation for discrepancies that resulted in unaccounted for narcotics including the events during her September 14, 2017 shift; (2) appeared on the narcotics hot list for *multiple consecutive months without sufficient reason*; and (3) exhibited strange behavior in the workplace.  ECF No. 52-3, ¶¶ 40- 42; ECF No. 52-2, at 70, 73 & 92.  This conduct followed the August 11, 2017 coaching on proper narcotics wasting and Plaintiff's June 7, 2017, 60-day probationary period for failure to maintain her Advanced Cardiovascular Life Support certification.  ECF No. 52-6 & 53-1, ¶62.  Accepting Nurse Prima's statements and assuming the necessary foundation to establish personal knowledge to support the opinions expressed in her affidavit, that evidence still falls far short of establishing that Plaintiff and Mr. Holley were treated differently in "nearly identical circumstances" or that Plaintiff was otherwise discriminated against based on her sex or pregnancy.

### C.  Plaintiff Has No Evidence of Pretext

Given the absence of evidence necessary to establish a prima facie case, Plaintiff has failed to meet her burden under *McDonnell Douglas*, and thus, no presumption of discrimination arises to shift the burden of production to Ochsner to articulate a legitimate, nondiscriminatory reason for the termination.  In the event Plaintiff could establish a prima facie case, Ochsner has set forth its legitimate business reasons for the termination decision.  *See* ECF Nos. 52-3; 52-4.  Thus, the

---

[50] A review of the anonymized "hot list" and Controlled Substance Discrepancy list reflect that no other employee appeared as frequently as Plaintiff, nor did any other employee have similar combined appearances.  ECF No. 57.

burden returns to Plaintiff to prove by a preponderance of the evidence that Ochsner's proffered reasons were not its true reasons, but were a pretext for discrimination, or that a motivating factor of the decision was the Plaintiff's protected characteristic.

Again, the issue at the pretext stage is not whether the employer's reason was actually correct or fair, but whether the decisionmakers honestly believed the reason.  Plaintiff may carry that burden by establishing pretext, either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence.[51]  For the reasons set forth in Subsections A and B, Plaintiff cannot establish disparate treatment.  Further, Plaintiff's termination occurred after another nurse reported concerns about Plaintiff's Fentanyl administration during the overnight September 14, 2017 shift, which resulted in an investigation that assessed Plaintiff's explanation for narcotics discrepancies that night as well as her history of repeated appearances on the narcotics "hot list" and Controlled Substance Discrepancy list.  Given the numerous people involved in the investigation and undisputed findings during that investigation, Plaintiff cannot establish that Ochsner's stated reason for termination is false or unworthy of credence.

When no rational factfinder could conclude that the action was discriminatory, such as when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred, summary judgment will be proper.  Given the undisputed evidence in this case, no rational factfinder could conclude that Ochsner's termination decision was motivated by Plaintiff's sex or pregnancy.

---

[51] *Goudeau*, 793 F.3d at 476 (citation omitted); *Reeves*, 530 U.S. at 143.

IV.    **CONCLUSION**

Plaintiff has not presented admissible evidence to establish a prima facie case of failure to accommodate or discrimination under Title VII and/or the Pregnancy Discrimination Act.  Even if she had, Ochsner has introduced sufficient evidence of its legitimate business reasons for its termination decision, shifting the burden back to Plaintiff.  Plaintiff has not established pretext. Accordingly, for the foregoing reasons,

IT IS ORDERED that Defendant's Motion for Summary Judgment (ECF No. 52) is GRANTED.

New Orleans, Louisiana, this _____25th_____ day of January, 2021.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE